UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JERRY JEROME WISE,<br><br>Defendant. | 4:20-CR-40104-KES-02<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Jerry Jerome Wise is before the court on a superseding indictment charging him with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.  See Docket No. 36.  Mr. Wise has filed a motion to suppress certain evidence.  See Docket No. 82.  The United States ("government") resists the motion.  See Docket No. 95.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on January 20, 2022.  Mr. Wise was there in person along with his lawyer, Anthony Sutton.  The government was represented by its Assistant United States Attorneys, Paige Petersen and

Connie Larson.  One witness testified and seven exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On July 27, 2020, around 8:13 p.m., Trooper Eric Peterson of the South Dakota Highway Patrol was parked in his patrol vehicle watching eastbound traffic on I-90 just west of I-29 near Sioux Falls, South Dakota.  The area he was observing was a construction zone, and the posted speed limit was 55 miles per hour.  He clocked a white Kia sedan with California license plates traveling at 62 miles per hour eastbound through the construction zone. Trooper Peterson testified that, as the Kia passed him, he observed the driver look at him with a worried expression then slouch in an apparent attempt to hide from view.  Trooper Peterson testified he also saw a passenger in the front passenger seat hide behind the driver.  Trooper Peterson pulled his vehicle out of the median and began driving to catch up to the Kia.  The Kia exited I-90, taking the ramp for I-29 north.  Trooper Peterson testified that, as the Kia rounded the exit ramp, he saw the passenger look back toward his patrol vehicle.  After entering I-29, Trooper Peterson turned on his vehicle's overhead lights and initiated a traffic stop of the Kia.

The entire stop was recorded by the dashboard camera of Trooper Peterson's patrol vehicle and a microphone on Trooper Peterson's person.  A second camera, this one located inside Trooper Peterson's patrol vehicle behind the driver's seat, recorded what happened within the patrol vehicle during the stop.  The recordings were admitted at the suppression hearing as Exhibit 1.

2

The court will cite the recordings in Exhibit 1 using the time of day shown in the recordings in hh:mm:ss format.

At 8:14:58, Trooper Peterson approached the Kia on the passenger side and explained to the driver, later identified as Damara CJ Needham, that she was speeding in a construction zone. At 8:15:15, Trooper Peterson told Ms. Needham he would issue her a warning and asked if she had her driver's license and registration. "Yes, I do," she said.

At 8:15:26, Ms. Needham handed Trooper Peterson a car rental agreement. She said her driver's license was in a bag in the back of the car and handed Trooper Peterson an Arizona identification card. Trooper Peterson asked Ms. Needham to retrieve her driver's license. Ms. Needham rifled through items in the car's back seat. At 8:15:58, Ms. Needham told Trooper Peterson she could give him her driver's license number. Trooper Peterson said they could go to his patrol car and he could look up her license using her name and date of birth. Trooper Peterson testified he needed her license and the car's registration to complete the warning. Hearing Transcript, Docket No. 101 at p. 11.

During this time, Trooper Peterson testified the passenger, later identified as Jerry Jerome Wise, the defendant in this matter, was smoking a freshly lit cigarette and ignoring Trooper Peterson while looking at his phone. Trooper Peterson testified Mr. Wise's hands were shaking and he did not assist Ms. Needham in looking for items or documents. Trooper Peterson testified he could see Mr. Wise's pulse through his shirt and in his neck. Through the

3

Kia's windows, Trooper Peterson testified he saw trash and bottles, which gave the car a "lived-in" look. He testified there were a few items, including a backpack and a jacket, in the backseat. Docket No. 101 at p. 33.

At 8:16:15, Ms. Needham exited the Kia, opened its trunk, and put something inside. Trooper Peterson testified he saw baskets of clothing in the trunk. Docket No. 101 at p. 33. She closed the trunk and told Trooper Peterson she had her paperwork. She walked to the front passenger door of Trooper Peterson's patrol car while looking at her phone and entered the vehicle at 8:16:38. Ms. Needham left the door open. Trooper Peterson asked Ms. Needham where she was coming from. She said, "Arizona, very far." She told Trooper Peterson she was moving and, when he asked to where she was moving, she said, "Where am I moving to? To Fargo." Trooper Peterson testified, based on reports of other traffic stops and seizures of drugs, Phoenix is a known source of drugs and Fargo is a known destination for drug traffickers. Docket No. 101 at p. 15.

At 8:17:15, on the recording from the camera inside Trooper Peterson's vehicle, Ms. Needham can be seen scrolling or swiping on her phone. She said she was retrieving her driver's license number. Trooper Peterson asked Ms. Needham why she was moving to Fargo, e.g., for work, and she said she does laser liposuction and was looking for a commercial space to rent.

At 8:17:29, Trooper Peterson ran a driver's license query using the information from the Arizona ID card Ms. Needham had given him. Exhibit 5 at pp. 9-10; Docket No. 99 at pp. 29-30. The query showed Ms. Needham was

4

"not eligible" for a driver's license.  Exhibit 5 at p. 10, Docket No. 99 at p. 30.
Trooper Peterson testified he assumed this meant she did not have a driver's
license, but he wanted to confirm that fact because she stated she in fact had a
license.  Docket No. 101 at p. 13.

At 8:17:57, Ms. Needham can be seen zooming in on a photograph of a
driver's license on her phone.  She began turning and moving the phone so
Trooper Peterson could see the photo, then pulled her phone away from
Trooper Peterson.  Trooper Peterson asked, "Do you have it?"  "I just have the
license number," she said.  Trooper Peterson testified he saw the driver's
license in the photo on Ms. Needham's phone, and the woman in the
photograph on the license appeared to be 50 or 60 years old.  Ms. Needham,
Trooper Peterson testified, looked to be in her early 30s.  Docket No. 101 at
p. 40.

At 8:18:16, Trooper Peterson ran a vehicle registration query using the
Kia's license plate number.  Exhibit 5 at pp. 11-12; Docket No. 99 at pp. 31-32.
It returned information about the vehicle identification number (VIN)
associated with the plate number and indicated the vehicle was registered to
EAN Holdings, LLC, which Trooper Peterson testified he thought meant the car
had been rented through Enterprise.  Exhibit 5 at p. 11; Docket No. 99 at
p. 31; Docket No. 101 at pp. 79-80.

At 8:19:18, Ms. Needham read Trooper Peterson a driver's license
number from her phone.  Trooper Peterson read it back to her, and
Ms. Needham confirmed he had it right.  Trooper Peterson asked from where in

Arizona Ms. Needham was coming.  She replied, "From my old apartment."  The two talked about the trip, and Ms. Needham mentioned they had traveled from Phoenix to the Sioux Falls area—22 hours in the car—without stopping many times.

Trooper Peterson ran a driver's license query at 8:19:30 using the driver's license number Ms. Needham had provided.  Exhibit 5 at pp. 13-14; Docket No. 99 at pp. 33-34.  The query returned information for a Debra Needham with a date of birth in 1961.  Exhibit 5 at p. 13; Docket No. 99 at p. 33.  The query also returned a Social Security number associated with Debra Needham. Id.

At 8:20:36, Trooper Peterson asked Ms. Needham if she got a new driver's license.  She said she did get a new driver's license.  Trooper Peterson asked Ms. Needham for the last four digits of her Social Security number.  He asked Ms. Needham to confirm the driver's license number she had given him.

At 8:21:27, Trooper Peterson queried the driver's license number again, this time requesting the picture associated with the license.  Exhibit 5 at pp. 15-16; Docket No. 99 at pp. 35-36.  The query returned the same information about Debra Needham and included a photograph.  Id.  Trooper Peterson testified his practice was to query license information without a picture because he usually had a driver's license—with the picture—in front of him.  In this instance, he realized he had no picture to compare to Ms. Needham, so he ran the query again with a request for a picture.  Id.

Trooper Peterson testified he asked Ms. Needham for the last four digits of her Social Security number because he wanted to confirm, both with the photograph and Social Security number associated with the Debra Needham driver's license number, whether or not the license number was in fact Ms. Needham's.  Docket No. 101 at p. 18.  Trooper Peterson testified this is a method he commonly uses to validate someone's identity.  Id.  Trooper Peterson determined the last four digits Ms. Needham gave him matched the Arizona ID card Ms. Needham provided, but not the driver's license number.  Id. at p. 19.  At this point, Trooper Peterson testified he believed Ms. Needham may have given him a false driver's license number to deceive him.  Id.  Impersonation to deceive a law enforcement officer is a class 1 misdemeanor in South Dakota. SDCL § 22-40-1.

At 8:21:38, Trooper Peterson asked Ms. Needham why she was driving a rental car to move, and she explained her car was in the shop.  Trooper Peterson asked what happened to her car, and she explained her ex-boyfriend had damaged it and that she was moving away from Phoenix to escape domestic violence.  Ms. Needham then told Trooper Peterson about her experiences going to police and considering getting a restraining order.

At 8:22:16, Trooper Peterson asked Ms. Needham when she rented the car, and it became apparent she had handed him a rental agreement for a different car from July 2020.  Ms. Needham apologized, asked if she could have that rental agreement back, and said she would go get the right rental agreement.  Trooper Peterson asked Ms. Needham if she had rented another

car around three weeks earlier, and she confirmed she had. Trooper Peterson testified this rental agreement listed Debra Needham as the renter. Docket No. 101 at p. 20.

At 8:23:14, Trooper Peterson asked Ms. Needham if the license number she had given him was from her license. She said it was. Trooper Peterson told Ms. Needham the license number returned information about a different person. "That's my license," she said. At 8:23:38, Ms. Needham said she had her paperwork in her backpack in the car and that she would get it for him. After some silence, she explained that she had to change her driver's license number because her driver's license, Social Security card, and passport were stolen. She told Trooper Peterson she had her driver's license paperwork in the car, and Trooper Peterson asked her to look for that paperwork and the correct rental agreement. Trooper Peterson ran another driver's license query using the name and date of birth from Ms. Needham's Arizona ID card at 8:23:58. Exhibit 5 at pp. 17-18; Docket No. 99 at pp. 37-38. It returned the same information as before, including a driver's license number that differed from the one Ms. Needham had given him. Exhibit 5 at p. 18; Docket No. 99 at p. 38.

At 8:24:37, they exited the patrol vehicle and began walking back to the Kia. At 8:24:44, Ms. Needham opened the trunk and began looking while Trooper Peterson stood near the passenger-side taillight. At 8:25:50, Ms. Needham handed Trooper Peterson papers she described as a bank statement showing that she had her driver's license and the correct car rental

8

agreement.  At 8:26:14, Ms. Needham closed the trunk and the two returned to Trooper Peterson's patrol vehicle.

Trooper Peterson looked through the papers Ms. Needham had given him.  He testified the papers did not show that Ms. Needham had a driver's license.  Ms. Needham said her license had been stolen, but now it was reinstated.  The papers indicated Ms. Needham was on probation.  She explained she was now off probation, and the probation was for nonpayment of fines related to traffic tickets.  Trooper Peterson testified he had never heard of someone being on probation for nonpayment of traffic fines.  Docket No. 101 at p. 24.  He further testified that he wanted to give Ms. Needham the benefit of the doubt about her driver's license because this stop was in late July 2020— in the midst of the COVID-19 pandemic.  Docket No. 101 at pp. 22-23.  He testified that many DMVs were backlogged or not serving people in person.  Id. at p. 23.  He testified that Ms. Needham repeatedly stated she had paperwork showing she had a valid license.  This paperwork, he testified, might be from a court reinstating her driver's license, which information may not have been relayed to or processed by the DMV due to pandemic-related delays.  Trooper Peterson testified he wanted to do his due diligence by examining whatever paperwork Ms. Needham gave him to determine whether she had a valid driver's license.  Id.

Ms. Needham told Trooper Peterson she started paying her traffic fines in 2019, and that was when her driver's license was reinstated.  At 8:28:09, Trooper Peterson queried the driver's license number his previous search

9

indicated was associated with the name and date of birth from Ms. Needham's Arizona ID card.  Exhibit 5 at pp. 19-20; Docket No. 99 at pp. 39-40.  This query also indicated Ms. Needham was not eligible for a driver's license. Exhibit 5 at p. 20; Docket No. 99 at p. 40.

At 8:28:53, Trooper Peterson told Ms. Needham his query for her driver's license status came back with "not eligible."  "Well, I have another paper, so, I paid my fines.  I have proof of all my receipts," she said.  Trooper Peterson testified he still did not know whether Ms. Needham had a valid license because she said she had paperwork proving so, and she was adamant. Docket No. 101 at p. 90.

At 8:29:11, Trooper Peterson asked Ms. Needham who the passenger was.  She said he was her boyfriend, Jerry.  Trooper Peterson said he would check the car's VIN.  Trooper Peterson asked Ms. Needham if she had the correct rental agreement in the vehicle.  She said, "Yes, sir," and that she would retrieve it.  They exited Trooper Peterson's patrol vehicle at 8:29:25.

Trooper Peterson testified he wanted to confirm the VIN because, in the case of a rental car, the definitive way to confirm whether the registration corresponds to a particular car is by checking to see if the VIN on the car matches the VIN associated with the registration information.  Docket No. 101 at p. 22.

Ms. Needham and Trooper Peterson walked up to the passenger door and began speaking to Mr. Wise through the passenger window.  Trooper Peterson testified Mr. Wise opened the glove box, took out some papers, and quickly

shut the glove box.  Docket No. 101 at p. 27.  While the glove box was open,
Trooper Peterson testified he observed a glass jar of the variety used by
cannabis dispensaries for the sale of bud cannabis products.  Id.  Trooper
Peterson testified his observation of the dispensary jar, together with
Ms. Needham's statements about the route and purpose of their travel, and
that they were driving such a long distance with few stops, made him
suspicious of drug trafficking.  Docket No. 101 at p. 32.

At 8:29:49, Mr. Wise handed some papers through the front passenger
window to Ms. Needham.  At 8:29:52, Trooper Peterson asked Mr. Wise if he
had his driver's license with him.  Mr. Wise's response is inaudible on the
recording, but Trooper Peterson replied, "You don't have one?  Okay."
Ms. Needham and Trooper Peterson, standing outside by the front passenger
door, began looking at the new papers.  At 8:30:09, Trooper Peterson identified
that this too was the wrong rental agreement because it was for a different
make and model of car.

At 8:30:17, Ms. Needham leaned through the front passenger window of
the vehicle while Trooper Peterson stood by.  She pulled back from the car with
more papers in hand.  "Let me find it, sir, I do have it," she said.  At 8:30:42,
she walked to the trunk of the Kia and began looking at the papers.  She asked
Trooper Peterson if she could show him the rental confirmation on her phone.
He told her that would be fine.  She opened the trunk and placed the papers
inside.  After closing the trunk, the two walked back to the patrol car at
8:31:06.  Trooper Peterson said he decided against walking to the front of the

11

vehicle to check the VIN at that time due to officer safety concerns; he did not want to be in front of the vehicle while Ms. Needham was out of the patrol car and near the Kia.  Docket No. 101 at p. 29.

After re-entering the patrol vehicle, Ms. Needham began looking through her phone.  Again, she left the passenger door open.  Trooper Peterson asked her if she usually does a lot of traveling.  She replied, "No, I haven't."  Trooper Peterson asked Ms. Needham if she rented the car, and she said, "Yes," while scrolling through her phone.  Trooper Peterson asked Ms. Needham if she had an apartment in Fargo or if she had bought a house.  Ms. Needham said she had not yet found a place to live.  She said she had only been to Fargo once, and she decided to move there because of her boyfriend, Mr. Wise.  Trooper Peterson asked if Mr. Wise lived in Fargo, and Ms. Needham told him, "No, Minneapolis."  Trooper Peterson commented on the distance between the two cities, and Ms. Needham said they were "not that far."

At 8:33:24, Ms. Needham told Trooper Peterson she was trying to find the emailed rental confirmation but could not.  She said she did not think she had it.  Trooper Peterson said that was fine, and he would check the VIN to make sure it matched the license plate query.  Trooper Peterson exited the vehicle at 8:33:50.  Ms. Needham remained in the passenger seat using her phone.

At 8:34:01, Trooper Peterson approached the Kia's front driver's side door and began speaking to Mr. Wise through the open window.  Trooper Peterson told Mr. Wise he would be checking the VIN and asked Mr. Wise where they were headed.  Mr. Wise said, "Fargo."  Trooper Peterson testified that Mr. Wise

12

told him he lived in Fargo.  Docket No. 101 at p. 30.  Trooper Peterson checked the VIN in the bottom driver's side area of the windshield and confirmed the last four digits matched the registration information he had queried.  Id.

At 8:34:20, Ms. Needham exited the patrol vehicle and walked to the Kia. Trooper Peterson walked around the front of the vehicle and began speaking to Mr. Wise through the open passenger's window.  Ms. Needham got into the driver's seat of the Kia.  Trooper Peterson walked back to the driver's door and talked with Ms. Needham, telling her he looked at the VIN and that they needed to go back to the patrol vehicle.  At 8:35:09, Ms. Needham exited the Kia, and she walked with Trooper Peterson back to the patrol vehicle.

They entered the patrol vehicle at 8:35:21, and Trooper Peterson explained that part of his job was investigating illegal activity on the roadways. He asked his first drug interdiction question at 8:35:45.  Ms. Needham denied the presence of anything illegal, cocaine, large amounts of cash, heroin, and methamphetamine in the car.  Trooper Peterson asked if there was cannabis in the car, and Ms. Needham told him there had been cannabis in the car, but not anymore.  At 8:36:03, Trooper Peterson asked how long ago there was cannabis in the car, and Ms. Needham said about an hour ago.  Trooper Peterson asked if there was any left, and Ms. Needham said there was still a roach in the car. Trooper Peterson asked if there were any other cannabis products in the car, and Ms. Needham said, "No."

At 8:36:32, Trooper Peterson informed Ms. Needham cannabis is illegal in South Dakota, and he would be performing a search of the Kia and her

person.  Ms. Needham asked Trooper Peterson if she could ask Mr. Wise how much cannabis he had left, and she began using her phone.  Trooper Peterson said he would ask Mr. Wise, and Ms. Needham stopped typing on her phone. Trooper Peterson asked if she knew where in the car the roach was, and Ms. Needham guessed it was in an ash tray.  At 8:38:11, they both exited the patrol car.

Ms. Needham walked toward the Kia's driver's side door while Trooper Peterson approached on the passenger side.  Trooper Peterson told Ms. Needham she did not need to be in the car for the search, and she said she was just grabbing her purse.  Trooper Peterson said he would be searching her purse and she did not need to grab it.  Ms. Needham opened the driver's side door and leaned into the car.  Trooper Peterson walked around the car and stood behind her at the open driver's door.  He told her to leave her purse. Ms. Needham backed up out of the car with a small, black-and-white zippered case in hand.  Trooper Peterson told her he would take the item in her hand. Ms. Needham leaned back into the car.  Trooper Peterson pulled Ms. Needham out of the car and told her to stand by the trunk of the car.  Ms. Needham can be seen on the recording putting something into her left front pants pocket. Trooper Peterson asked what it was, and Ms. Needham said it was a bag of weed.  Trooper Peterson asked Ms. Needham to take it out of her pocket.  She did, then tossed it through the open car door to Mr. Wise.  Trooper Peterson pulled Ms. Needham away from the car, called for backup, and began handcuffing her.  At 8:40:14, Mr. Wise tossed the baggie into the ditch next to

14

the interstate.  At 8:40:55, Trooper Peterson got Mr. Wise out of the Kia and handcuffed him.

A search of the Kia ensued.  Another South Dakota Highway Patrol trooper recovered the baggie in the ditch.  It contained approximately 3.5 grams of meth.  Also recovered from the vehicle were two zip-top bags containing a total of 655 grams of meth, 754 oxycodone pills, cannabis, cannabis paraphernalia, and three doses of Suboxone.  Well after Trooper Peterson placed Ms. Needham and Mr. Wise under arrest, another trooper requested a tow truck for the Kia.

At the hearing, Trooper Peterson identified a discrepancy in the police reports as to whether the dispensary jar he testified he observed in the glove box was ultimately found in the glove box during the search.  The jar was logged as being found in Ms. Needham's purse.  Docket No. 101 at pp. 101-02.  Trooper Peterson testified the report was incorrect and the inaccuracy was a clerical error on his part.  Id. at pp. 102, 105.  At 8:49:49, during the search of the Kia, a South Dakota Highway Patrol trooper identified by the government as Trooper Renteria appears to take a jar from the area of the front passenger seat and sniff it.  Though the audio quality is poor, Trooper Renteria can be heard saying, "It's not CBG; it's weed."[1]  The jar was labeled "CBG Hemp Flower."  Exhibit 7 at p. 1; Docket No. 99 at p. 44.

---

[1] Trooper Renteria was subpoenaed and available to testify at the suppression hearing, but neither party called him as a witness to clarify this issue.

Trooper Peterson also testified that the South Dakota Highway Patrol has an inventory policy that applies whenever a vehicle is towed and placed in the custody of that agency.  Docket No. 101 at pp. 37-38, 103-04.  Under the policy, any vehicle towed by the Highway Patrol is searched and its contents inventoried.  Id. at pp. 37-38.

Mr. Wise was indicted by a federal grand jury on a two counts of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846.  He was charged with conspiracy to distribute 500 grams or more of a mixture of substance containing methamphetamine and conspiracy to distribute oxycodone, a Schedule II controlled substance.  See Docket No. 1.  A two-count superseding indictment was later returned by the grand jury.  Count I remained the same but count II was changed to conspiracy to distribute 40 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance.  See Docket No. 36.  Mr. Wise now moves to suppress all evidence obtained in the search.

**DISCUSSION**

**A.    General Principles Guiding Traffic-Stop Analyses**

Mr. Wise asserts the evidence obtained during the search of the Kia should be suppressed because Trooper Peterson violated the Fourth Amendment by unreasonably prolonging the traffic stop and conducting an unlawful search of the vehicle.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and

16

effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004). Therefore, a traffic stop must be supported by reasonable suspicion or probable cause. United States v. Chartier, 772 F.3d 539, 543 (8th Cir. 2014).

It is settled law that the principles of Terry v. Ohio, 392 U.S. 1 (1968) govern traffic stops. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. Berkemer v. McCarty, 468 U.S. 420, 439 . . . (1984). As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 . . . (1968)." Jones, 269 F.3d at 924.

The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Thus, a traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]" United States v. Jacobsen, 466 U.S. 109, 124 (1984). Mr. Wise does not dispute that the initial traffic stop was justified. Therefore, the question before the court is whether the stop was unjustifiably prolonged beyond the limitations of the Fourth Amendment.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic

violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407 (2005)], and attend to related safety concerns[.]"  Rodriguez, 575 U.S. at 354. See also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500.  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  Caballes, 543 U.S. at 407.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  Rodriguez, 575 U.S. at 354.

**B.    Mr. Wise's Standing To Challenge the Search**

Fourth Amendment rights are personal and may not be asserted vicariously.  Alderman v. United States, 394 U.S. 165, 174 (1969).  Only those with a reasonable expectation of privacy in the place searched may bring a Fourth Amendment challenge.  Minnesota v. Carter, 525 U.S. 83, 88 (1998).  A passenger who asserts "neither a property nor a possessory interest" in a vehicle lacks a reasonable expectation of privacy in that vehicle.  Rakas v. Illinois, 439 U.S. 128, 148 (1978).  Even where a search is unlawful, a passenger without such an interest in the vehicle normally cannot challenge its

18

search or suppress resulting evidence.  United States v. Anguiano, 795 F.3d 873, 878-79 (8th Cir. 2015).

When Trooper Peterson stopped the Kia, Mr. Wise was in the passenger seat and did not have a driver's license.  He has not asserted that he drove or was permitted to drive or exercise control over the rental car.  As a passenger without a property or possessory interest, Mr. Wise did not have a reasonable expectation of privacy in the vehicle.

"That said, [Mr. Wise] may still challenge the search if he was unreasonably seized during the traffic stop and the seizure caused an unlawful search."  United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019).  "A passenger may suppress evidence found in a vehicle search when an unreasonably extended traffic stop causes the search."  Id. (citing United States v. Peralez, 526 F.3d 1115, 1121 (8th Cir. 2008)).  Only if an unreasonably extended traffic stop was "at least a but-for cause of obtaining the evidence" is suppression of evidence the appropriate remedy.  United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007) (citing Hudson v. Michigan, 547 U.S. 586, 592 (2006), and Segura v. United States, 468 U.S. 796, 815 (1984)).  Thus, even absent a showing that Mr. Wise had a reasonable expectation of privacy in the Kia, he has standing to challenge the legality of his detention and any search that resulted from his illegal detention.

Thus, the court must first determine if the stop was unreasonably extended.  If the seizure was not unreasonably extended, Mr. Wise does not have standing to challenge the search.

### 1.    The Stop Was Not Unreasonably Extended.

"Beyond determining whether to issue a traffic ticket, an officer's mission [during a traffic stop typically] includes ordinary inquiries incident to the traffic stop . . . .  Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355 (citations omitted and cleaned up). See also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)).  "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine.' " United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (quoting Olivera-Mendez, 484 F.3d at 510.

A traffic stop may lawfully be extended if an officer develops reasonable suspicion of criminal activity.  United States v. Riley, 684 F.3d 758, 763, 765 (8th Cir. 2012) (cleaned up).  A reasonable suspicion is "some minimal, objective justification" for suspicion beyond an "inchoate hunch." Fuse, 391 F.3d at 929 (cleaned up).  "Th[e reasonable suspicion] standard requires that officers be able to point to specific, articulable facts justifying the seizure." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010).

### a.    Reasonable Suspicion—Dispensary Jar

Here, Trooper Peterson did not unreasonably extend the stop beyond the time reasonably required to complete the initial purpose of issuing a warning for speeding in a construction zone before he observed the dispensary jar in the glove box..  In the course of the traffic stop, Trooper Peterson attempted to inspect Ms. Needham's driver's license, looked up the Kia's registration information, and asked Ms. Needham routine questions about her destination, route, and the purpose of her travel.  The Supreme Court and the Eighth Circuit have affirmed these are routine elements of a traffic stop, and their completion is within the scope of the initial purpose of the stop.  Delaware v. Prouse, 440 U.S. 648, 658-60 (1979) (routine inquiries include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance); United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (finding questioning occupants about their destination and itinerary is a routine task incident to a traffic stop).

However, Trooper Peterson was unable to effectively inspect Ms. Needham's driver's license because she deliberately misled him about her license status.  Although ascertaining Ms. Needham's license status should have been a simple matter, she provided Trooper Peterson with someone else's license number and insisted—over his findings that she was not eligible for a driver's license and the license number was associated with someone else—that she could prove she had a valid license.

It was while Trooper Peterson was allowing Ms. Needham to look (again) for documents that would show she had a valid license, approximately 15 minutes into the stop and still within the initial scope of the traffic stop, that he observed a dispensary jar in the glove box. With this observation, Trooper Peterson had reasonable suspicion to extend the stop to ask Ms. Needham drug interdiction questions. See United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016) (holding that smell of cannabis supported probable cause to search vehicle); United States v. Johnson, No. 14-cr-130 (SRN/SER), 2014 WL 5860478, at *4-5 (D. Minn. Nov. 12, 2014) (finding officer's observation of marijuana flakes on defendant's shirt provided reasonable suspicion to extend stop). And it was shortly after Trooper Peterson began asking drug interdiction questions that Ms. Needham said there was a roach in the car—approximately six minutes after Trooper Peterson observed the dispensary jar and approximately 21 minutes into the stop. The Eighth Circuit has held that an officer's observation of other evidence of marijuana use—namely its odor—can support probable cause to search a vehicle. United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020) ("[The Eighth Circuit has] repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception."). Therefore, at that point, Trooper Peterson had probable cause to believe there was contraband in the car and initiated a lawful search. Id.

Mr. Wise criticizes Trooper Peterson for repeatedly checking Ms. Needham's driver's license status. Mr. Wise suggests Trooper Peterson's

repeated driver's license queries amounted to an unreasonable extension or, at least, a dilatoriness that belabored the stop and enabled him to ask additional questions of Ms. Needham. Mr. Wise's blame is misplaced. It was Ms. Needham, not Trooper Peterson, who insisted she had a valid driver's license and repeatedly claimed there was (more) paperwork in the car to prove it. Trooper Peterson testified he believed he was doing his due diligence by permitting Ms. Needham to find documentation establishing her valid licensure.

Contrary to Mr. Wise's protestations, Trooper Peterson was not required to initiate "community caretaking functions" (i.e., inquire about Mr. Wise's driver's license or call a tow truck) immediately after his first license query showed Ms. Needham was not eligible for a driver's license. Trooper Peterson was in no way obligated to discount Ms. Needham's unequivocal insistence that she had a valid license; Trooper Peterson had an equal—if not greater—duty to avoid wrongfully issuing Ms. Needham a citation for driving without a license by permitting her to show him proof of a valid driver's license or, an equally bad option, allowing a person to drive off in a car knowing that person had no valid driver's license.

This is especially true considering the timing of this stop—late July 2020, in the midst of the first wave of the COVID-19 pandemic. Trooper Peterson testified DMVs were delayed in processing requests to reinstate driver's licenses, e.g., by court order, as would be the case were Ms. Needham telling the truth about her license being reinstated after she paid off her

23

parking tickets.  Under the facts of this case, namely Ms. Needham's repeated insistence that she could prove she had a valid license, Trooper Peterson did not unlawfully prolong the stop by permitting her to look for documents showing she had a valid driver's license.

### b.    Reasonable Suspicion—Impersonation

Further, any extension in the stop's duration due to Trooper Peterson's investigating Ms. Needham's license status was justified.  In this stop, a complication arose as soon as Ms. Needham gave Trooper Peterson someone else's driver's license number.  When Ms. Needham was using her phone to pull up a photo of the driver's license associated with "Debra Needham," Trooper Peterson testified he observed on the license a photograph of a woman who appeared approximately twice Ms. Needham's age.  Then, after he queried the driver's license number she had given him and determined it was associated with someone whose first name was different, Trooper Peterson was able to confirm, using the Social Security number and photograph, the driver's license number Ms. Needham had given him was not hers.

At this point, Trooper Peterson had reasonable suspicion sufficient to prolong the stop to investigate whether Ms. Needham was impersonating another to deceive law enforcement, a class II misdemeanor in South Dakota. See United States v. Brunt, 35 F. App'x 285, 286 (8th Cir. 2002) (finding police officer did not unreasonably lengthen traffic stop to investigate driver's giving him a false name); United States v. Newland, 246 F. App'x 180, 188 (4th Cir. 2007) (finding officer's suspicion that driver have him a fake driver's license

contributed to reasonable suspicion to extend traffic stop).  The scope of the stop expanded to include the time reasonably required to ascertain whether Ms. Needham had deliberately impersonated another to deceive Trooper Peterson and, if she had, attend to that independent crime through arrest or otherwise.

### c.    Reasonable Suspicion—Other Articulable Facts

Trooper Peterson had reasonable suspicion to extend the stop apart from his observation of the dispensary jar and Ms. Needham's apparent impersonation to deceive police.  Trooper Peterson testified that Ms. Needham's answers to questions about her route and purpose were suspicious.  She told him she was moving from Phoenix to Fargo in a rental car, but that the car she owned was in the shop—presumably in Phoenix, meaning she would have to travel back to Phoenix to get it.  She told him she was moving to Fargo because of Mr. Wise, but that he lived "not that far" away in Minneapolis— approximately three-and-a-half hours away by car.  She told Trooper Peterson they had driven for 22 hours with few stops, and Trooper Peterson testified the contents of the car were not consistent with what an ordinary person would bring on a move.  Docket No. 101 at p. 33.  And she stated she did not yet have a place to live or work in Fargo.  See United States v. Murillo-Salgado, 854 F.3d 407, 416 (8th Cir. 2017) (finding reasonable suspicion to extend traffic stop based on odd responses to routine questions).

On top of these suspicious responses, Trooper Peterson testified Phoenix is known as a place of origin for drug distribution and Fargo is a known

25

destination for drug traffickers based upon reports he had read about other traffic stops that resulted in drug seizures.  See United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005) (finding car's travel on known drug corridor contributed to reasonable suspicion to extend traffic stop).

Trooper Peterson also testified that third-party vehicle rentals (i.e., where a person other than the driver rents the vehicle) and multiple rentals within a short timeframe may indicate drug trafficking.  Docket No. 101 at p. 33.  Here, Ms. Needham handed Trooper Peterson two rental agreements for cars other than the Kia she was driving.  One was for a week-long period approximately three weeks before the stop.  At least one of those prior rental agreements indicated the authorized driver was "Debra Needham."  C.f. Davis, 943 F.3d at 1133 (8th Cir. 2019) (finding renter's absence contributed to reasonable suspicion to extend traffic stop).

Thus, while Trooper Peterson was trying to ascertain whether Ms. Needham did, in fact, have a valid driver's license, she handed him documentation of two other vehicle rentals (a total of three rentals including the Kia), at least one of which was in the same name as the (false) driver's license number she had provided him.  Together, these specific and articulable circumstances, all of which Trooper Peterson testified to, support a reasonable suspicion of criminal activity—namely drug trafficking—to justify extending the stop to ask basic drug interdiction questions.  See United States v. Sanchez, 955 F.3d 669, 674 (8th Cir. 2020) (citation omitted) (courts assess reasonable suspicion based on the totality of the circumstances, allowing officers to draw

26

on their own experience and specialized training to make inferences from the cumulative information available to them).

As described fully herein, Ms. Needham told Trooper Peterson about the roach in direct response to his drug interdiction questions.  This admission that there was cannabis in the car gave Trooper Peterson valid probable cause to search the vehicle under the automobile exception to the warrant requirement.  See United States v. Kennedy, 427 F.3d 1136, 1140-41 (8th Cir. 2005) (citation omitted) (noting the "automobile exception" permits police to conduct a warrantless search of a vehicle if, at the time of the search, they have probable cause to believe that the vehicle contains contraband).  "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Ms. Needham's admission to the presence of cannabis established a fair probability that contraband would be found in the car.

For these reasons, Trooper Peterson had reasonable suspicion based on the totality of the circumstances to justify extending the stop beyond the time reasonably required to accomplish its original mission.  Trooper Peterson developed probable cause to search when Ms. Needham told him there was cannabis in the car, and Mr. Wise was not seized in violation of his Fourth Amendment rights.

## 2.    Mr. Wise's Arguments

Mr. Wise raises several arguments in resistance to this conclusion.  The court addresses them in turn.

### a.    Whether Trooper Peterson Acted with the Required Diligence To Investigate the Stop, Complete Its Mission, and Address the Attendant Safety Concerns

Mr. Wise argues Trooper Peterson unlawfully prolonged the stop because he failed to act swiftly in removing the Kia from the roadway after his first driver's license query returned information that Ms. Needham was not eligible for a driver's license.  "This is evidenced by the fact that Trooper Peterson did not take any steps to ascertain the legal ability of Mr. Wise to operate the Kia until approximately 16 minutes after the stop,[2] . . ., and that [police] did not call for a tow truck to remove the Kia until 40 minutes after the stop began."  Docket No. 83 at p. 14.  For the reasons discussed below, the court rejects this rationale.

As part of this community-caretaking-function argument, Mr. Wise asserts this case is distinguishable from Soderman, 983 F.3d 369; and United States v. Johnson, No. 4:20-cr-40109, 2021 WL 1687255, at *7 (D.S.D. Apr. 29, 2021) (following Soderman and rejecting argument that police had a duty to promptly inform driver with revoked license he would need to call a licensed driver or tow truck to retrieve vehicle).  In Soderman, a motorist was pulled

---

[2] It is a minor distinction, but, considering the overall length of this stop—just 21 minutes before Ms. Needham admitted there was cannabis in the car, it is worth noting.  Trooper Peterson asked Mr. Wise about his driver's license at approximately 8:30 p.m., 15 minutes into the traffic stop, not 16 minutes.

over for speeding on an interstate in Iowa while traveling from Colorado to Minnesota to visit his father.  Id. at 372.  While completing a records check incident to the stop, the Iowa State Trooper who stopped Soderman discovered that his driver's license had been suspended.  Id. at 372-73.  The trooper also believed he had observed indicia of drug trafficking and requested support from a drug interdiction officer.  Id. at 373.  Soderman called a tow truck to pick up his vehicle because he could not lawfully drive it with a suspended license.  Id.

The drug interdiction officer arrived before Soderman's tow truck.  She concluded, based upon her observations of Soderman, what was visible in the vehicle's passenger compartment, and information she received in a phone conversation with Soderman's father[3] that she had probable cause to believe there was drug paraphernalia in the car.  Id.  The officer seized the vehicle and called a second tow truck.  Id.  The trooper issued Soderman tickets for speeding and driving with a suspended license.  Id.  Soderman's tow truck arrived, and the drug interdiction officer told the driver she would be using the services of a different company.  The tow truck left.  Id.

Shortly thereafter, and 75 minutes after the traffic stop began, Soderman walked away from the scene, leaving his vehicle with the trooper and the drug

---

[3] Because Soderman was confused about their exact location on the interstate, he handed the officer his phone so she could give Soderman's father directions. During her conversation with Soderman's father, the officer asked several questions about Soderman's history of drug trafficking and his plans to visit him in Minnesota.  Soderman's father told the officer Soderman had been involved in trafficking in the past, and he did not know Soderman was on his way to Minnesota for a visit.  Soderman, 983 F.3d at 373.

interdiction officer.  Id.  The second tow truck arrived, and it delivered Soderman's vehicle to the impound lot.  Id.  The drug interdiction officer obtained a warrant[4] to search the vehicle.  Id.  During the search, the officer discovered drugs and contraband.  Id.  Thereafter, Soderman moved to suppress the evidence obtained from his vehicle and statements he made during the traffic stop.  Id.  The district court denied the motion to suppress, and Soderman appealed.  Id.

On review, the Eighth Circuit considered Soderman's argument that the initially valid traffic stop was unlawfully extended in violation of Rodriguez.  Id. at 374.  Soderman argued the trooper extended the traffic stop beyond the time reasonably required to complete its mission, thereby giving the drug interdiction officer time to arrive, develop probable cause, and seize the vehicle. Id.  The Eighth Circuit held that the trooper did not unreasonably prolong the detention of Soderman because the discovery that Soderman was driving on a suspended license created a complication that justifiably extended the lawful scope of the traffic stop.  Id.  The Eighth Circuit rejected Soderman's argument on this basis, finding the trooper did not unlawfully prolong the traffic stop because the scope of the stop expanded once it was ascertained a licensed driver or tow truck would need to remove the vehicle from the roadway.  Id.

---

[4] The officer mistakenly submitted only an application and affidavit for a search warrant without submitting the warrant itself.  Soderman, 983 F.3d at 373.

Here, Mr. Wise argues Trooper Peterson's failure to promptly engage in community caretaking amounted to an unreasonable extension of his seizure of Mr. Wise because Trooper Peterson did not immediately confront Ms. Needham about her "not eligible" license status, determine if another licensed driver could operate the Kia, or request a tow truck.

This case *is* distinguishable from <u>Soderman</u> and <u>Johnson</u>, but not in a way that favors Mr. Wise. While it is true the first driver's license query returned information to Trooper Peterson that Ms. Needham was not eligible for a driver's license, Ms. Needham was relentless in her insistence that she had a valid driver's license. Even when Trooper Peterson confronted Ms. Needham about her "not eligible" status and that the driver's license number she gave was associated with a different name, she rejected that information and insisted again she could provide documents proving she had a valid driver's license.

Thus, unlike in <u>Soderman</u> and <u>Johnson</u>, it was not clear for some time to Trooper Peterson whether Ms. Needham was eligible to drive the Kia. Trooper Peterson's efforts to ascertain Ms. Needham's license status were stymied by her denials and deflections. Unlike in <u>Soderman</u> and <u>Johnson</u>, Trooper Peterson was prevented from moving past inspecting Ms. Needham's driver's license—a fundamental and routine element of every traffic stop—to going about removing the Kia from the roadway. Mr. Wise's assertion that Trooper Peterson repeatedly asked Ms. Needham questions about her driver's license status is wholly unsupported by the record. It was Ms. Needham who

31

belabored the stop by insisting, even over Trooper Peterson's attempt to confront her with the truth about her license status, she could prove she had a valid driver's license.

Mr. Wise's fixation on Trooper Peterson's community caretaking function is myopic.  Trooper Peterson also had a duty to investigate crimes occurring on South Dakota's roadways.  As explained in the first section of this analysis, Trooper Peterson had abundant cause for reasonable suspicion that contraband or evidence of a crime was present in the Kia.  And Trooper Peterson was entitled to investigate the inconsistent driver's license information Ms. Needham provided him to ascertain whether she had intentionally given him false identification to deceive him—a separate crime under South Dakota law.  Even if Trooper Peterson could have completed the warning after the first driver's license inquiry, Ms. Needham's conduct justified extending the seizure to ascertain whether, as she insisted, she had a valid license and, if not, whether she was unlawfully impersonating another.

### b.    Whether Trooper Peterson Engaged in a Blended Process

Mr. Wise also asserts Trooper Peterson improperly engaged in a blended process by engaging in drug interdiction before he had reasonable suspicion to support such questions.  He argues, "Trooper Peterson's focus during the stop of the Kia was on drug interdiction[,] and he sought to intermix his drug interdiction questions with his other statements to Needham."  Docket No. 83 at p. 20.  See Peralez, 526 F.3d at 1121 (traffic stop was unlawfully extended where officer "engaged in a 'blended process' of conducting a routine traffic

stop and a drug interdiction investigation"). This characterization is clearly contradicted by the record.

Here, Trooper Peterson asked no drug-interdiction questions until he observed the dispensary jar in the glove box. His observation of the dispensary jar in the glove box gave him reasonable suspicion to extend the stop to ask drug-interdiction questions. Before he inquired about drugs, Trooper Peterson demarcated the interdiction questions from the routine traffic-stop questions by explaining to Ms. Needham that part of his job involves investigating anything illegal on South Dakota's roadways.

The record unequivocally establishes that Trooper Peterson asked no drug-related questions and pursued no drug-related investigation until he had reasonable suspicion to investigate whether there was evidence of drug-related criminal activity in the Kia. Therefore, Mr. Wise's assertion that Trooper Peterson improperly blended drug interdiction with routine questions about the traffic stop (including inspecting driver's license, registration, route, destination, and purpose) is without support in the record.

### c. Whether Trooper Peterson's Suspicion Was Based Solely on Pre-Stop Indicators

Lastly, Mr. Wise asserts Trooper Peterson lacked reasonable suspicion to prolong the stop because his suspicions were primarily based on pre-stop behaviors of nervousness. Mr. Wise argues this case is analogous to United States v. Cheng Kong Yang, 432 F. Supp. 3d 957 (D.N.D. 2020). In that case, the District of North Dakota suppressed evidence seized from a traffic stop under Rodriguez after a North Dakota Highway Patrol trooper requested the

33

assistance of a canine unit and extended the stop based on pre-stop indicators

of nervousness.  Id. at 962-64, 978.  The court concluded the pre-stop

indicators—including rigid posture and ignoring the trooper—were nothing

more than innocuous behaviors and the trooper lacked reasonable suspicion to

extend the seizure beyond the time required for issuing a traffic citation.  Id.

at 978.

> Though nervous behavior and high pulse rate can contribute to a finding of reasonable suspicion, United States v. Anguiano, 795 F.3d 873, 877 (8th Cir. 2015), the Eighth Circuit has cautioned against undue reliance on similar factors, stating it "certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer," United States v. Jones, 269 F.3d 919, 929 (8th Cir. 2001) (internal quotation marks omitted).

Id.

The court is in accord with the District of North Dakota's assessment.

These factors should not be unduly relied upon in the analysis of reasonable

suspicion to prolong a traffic stop.  However, the facts of this case differ greatly

from Yang.  Although Trooper Peterson testified he observed nervous behaviors

from both Mr. Wise and Ms. Needham—both before and after the stop—and an

elevated pulse in Mr. Wise, Trooper Peterson did not rely on those observations

alone to develop reasonable suspicion to believe contraband or evidence of a

crime was in the Kia.  Instead, as described fully herein, Trooper Peterson

articulated reasons why he believed Ms. Needham was intentionally

impersonating another to deceive him, reasons why Trooper Peterson believed

Ms. Needham was involved in drug trafficking based upon her responses to

routine questions and the numerous rental agreements, at least one of which

was in a third-party's name, and his observation of the dispensary jar in the glove box. These objective, articulable factors support a reasonable suspicion of criminal activity, and the seizure of Mr. Wise was not unreasonably prolonged.

Because Trooper Peterson acted on reasonable suspicion to extend the traffic stop, Mr. Wise was not unreasonably seized in violation of the Fourth Amendment. This leaves him without standing to challenge the search of the Kia. Davis, 943 F.3d at 1134. Because Mr. Wise lacks a reasonable expectation of privacy in the car as a passenger, he cannot assert a Fourth Amendment challenge to the vehicle search. Anguiano, 795 F.3d at 878-79. For these reasons, this magistrate judge respectfully requests denying the motion to suppress.

## C.    Inevitable Discovery

In the alternative, the government argues the contraband found in the Kia should not be suppressed because it would have been discovered in an inventory search of the vehicle after it was towed. The inevitable discovery doctrine creates an exception to the exclusionary rule. United States v. Smith, 21 F.4th 510, 517 (8th Cir. 2021). Under that doctrine, "the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the

constitutional violation." <u>United States v. Conner</u>, 127 F.3d 663, 666 (8th Cir. 1997) (citation omitted).

Here, Trooper Peterson determined neither Ms. Needham nor Mr. Wise had a valid driver's license.  Even absent any indicia of further criminal activity, neither could have lawfully removed the Kia from the roadway. Considering that the car was a rental, both its occupants were from out-of-state (i.e., there were no nearby friends or relatives to retrieve the car), and neither of them had a valid driver's license, the only viable option for police to remove the vehicle was using a tow service.  As Trooper Peterson explained, the car would have been searched and its contents inventoried after it was towed. In any event, having concluded the seizure of Mr. Wise was lawful, the court need not decide whether the contraband would have been inevitably discovered in an inventory search.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Jerry Jerome Wise's motion to suppress [Docket No. 82] be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black,

781 F.2d 665 (8th Cir. 1986).

DATED this 28th day of January, 2022.

BY THE COURT:

_____

VERONICA L. DUFFY
United States Magistrate Judge